DETERMINED IN THE

# FIRST DISTRICT

OF THE

# APPELLATE COURTS OF ILLINOIS

## DURING THE YEAR 1908.

---

## Society of St. Stephen the Martyr v. Mrs. Stephen Sikorski et al.

### Gen. No. 13,774.

1. APPEALS AND ERRORS—*what questions may be considered upon review of judgment of Municipal Court.* Where no written pleadings are required in the Municipal Court, the fact that written pleadings are filed, not presenting questions raised on review, is not material, and the Appellate Court may consider such questions if they properly arise upon the record filed.

2. CORPORATIONS—*what contracts ultra vires.* A corporation organized for "social and religious purposes," not for pecuniary profit, under the general incorporation act and not purporting to be organized under the act of June 23, 1883, has no authority to make valid contracts for death benefits dependent upon the assessment of members.

Assumpsit. Error to the Municipal Court of Chicago; the Hon. EDWARD A. DICKER, Judge, presiding. Heard in this court at the October term, 1907. Reversed. Opinion filed April 20, 1908.

FRANK H. JANISZESKI, for plaintiff in error.

HEFFRON & CADDICK, for defendants in error.

MR. JUSTICE BROWN delivered the opinion of the court.

The plaintiff in error in this case is a corporation, the full name of which in Polish means, it would

(1)

seem, The Roman Catholic Society of Brotherly Assistance of St. Stephen the Martyr.

It was organized September 6, 1892, under that part of the General Incorporation Act relating to corporate associations not for pecuniary profit. The object for which it was formed was stated in its articles of association and certificate of incorporation to be "for religious and social purposes."

The translation of the constitution, which was put in evidence, is in indifferent English, but its meaning is sufficiently intelligible. Various provisions affecting the cause at bar are as follows:

"ARTICLE II.    AIM OR OBJECT OF THE SOCIETY.

The object of this society begun in Chicago, at St. Stanislaus Church, under the name of St. Stephen the Martyr, is a mutual connection into a unbreakable knot with regularly monthly fee to support the sick and poor and through accident or death afflicted their relation and families.

ARTICLE III.    CONDITIONS IN ACCEPTING CANDIDATE.

Every Roman Catholic Pole of good character, healthy body, and sane mind, age 18 to 35 years, can be accepted as a member of St. Stephen the Martyr's, if he fills out the following conditions: 1. He has to be proposed by two members who know him personally to be a good Catholic and upright man, not less than one year. 2. He has to pay the entrance fee instituted by the Society. 3. He must pass one month's trial. 4. He has to show a certificate if he is 30 years of age, the Society does not want certificates from candidates below 30 years of age.

ARTICLE VI.    SECTION 14.

To the Recording Secretary shall come letters from sick or dead members asking for financial help; he shall then within twenty-four hours notify the Sick Committee after he receives the notice.

ARTICLE VII.    SECTION 1.

FUNDS OF THE SOCIETY.

The funds of the Society of St. Stephen shall be

raised from the entrance fee, which must be paid by each member, from monthly dues and special fees proposed at one meeting and accepted at the next by the society, from fines spoken of the constitution and voluntary offers.

### ARTICLE VIII.    CARE OVER SICK.

Section. 1.    Care over sick shall be in the hands of the Tutor of Sick and Committee of Members.

Section 2.    Committee visiting the sick composed of seven members shall be appointed every month by the Recording Secretary, according to the Recording Book and only to two sick per day, and in case of more than two sick persons are found, the Recording Secretary shall appoint another Committee, and those will be on duty one month.

Section 3.    Members of the Sick Committee notified about a sick brother, shall visit him every week by terms, providing the sickness is not contagious.

Section 4.    In case of dangerous sickness, the Committee after conference with the Tutor of Sick shall notify the Secretary, and he shall appoint four close living members to guard him. Two of them from 8 to 12 P. M., and two from 12 to 4 A. M., and only night time.

Section 5.    Duty of Tutor of Sick shall be in look for the proper assistance from the Treasury of the Society for the sick brother and hand the said assistance to the member after proper settlements. It is also his duty in case of nearing death to see that the sick brother gets the right religious help, that he may confess when conscious and receive the Blessed Sacraments.

### ARTICLE IX.    DUTIES OF MEMBERS.

Section 2.    All fines, dues and voluntary or necessary collections ought to be paid at a regular meeting to the Financial Secretary.

Section 6.    Every member sick or injured shall receive appointed financial assistance, providing the said sickness or injury was not caused by drinking or immoral life. If he is the fault of sickness, he shall receive no assistance.

Section 7.    A member not paying his dues or spe-

cial collections during 3 months, shall in case of sickness, receive no assistance. If he has not paid for 6 months, and is able to pay and does not pay, he shall be thrown out of the Society; on the other hand, a member not able to pay his dues from six months and wishes to remain a member of the Society, must publicly explain his case to the Society, and the Society can prolong his payment.

Section 11. A member publicly going against the Catholic Faith, leading an immoral or irreligious life, disgracing the church, priest or his own society, shall be immediately cast out of St. Stephen the Martyr's Society, his money will not be refunded and assistance rejected.

Section 12. The Society of St. Stephen the Martyr shall celebrate a holiday on Sunday after St. Stephen's day, * * * and the whole Society shall go to confession and holy communion.

ARTICLE X. PRIVILEGES OF MEMBERS.

Section 2. Every member of St. Stephen's Society in case of sickness shall receive $5.00 a week as assistance. Being sick one week he receives no assistance, but being ill fully two weeks or more, will receive from date of notice being sent to Recording Secretary the above mentioned assistance after six months shall receive only a half, that is $2.50 weekly till a year; after a year he will receive no assistance in sickness, *nor after death assessment till death.*

Section 4. *The Society is obliged to pay $300 in case of death of a member, which sum members must raise, and the amount to be collected from each member depends upon the number of members. In the case of death of a member's wife, the Society is obliged to pay $200, which sum is collected from the members.*

Section 5. *If the Society takes the funeral of the member in its hands, it shall pay the expense of the burial from those $300, and the rest is returned to the heirs of the dead member.*

Section 7. *Every member must pay after the death of a brother the sum appointed by the Society, within three months after the death under the fine of suspension.*"

Section 20 of Article VI is:

"The Financial Secretary shall notify all those whose dues from three months are not paid; in case of six months the member shall be announced publicly and having been notified by a registered letter and does not pay, the member shall be crossed out from the list of members."

Sections 7 and 8 of Article VIII are:

"A member abusing the assistance of the Society, this being proved to him, shall be suspended or expelled. No suspending shall last over 3 months. A suspended member loses all rights and privileges to the Society.

"If member under suspense, after time of suspend is over, gives a testimonial of good health from a physician, can be accepted to the Society, that also if he pays his debts to the Society made during the suspension."

We have at such length given excerpts from the constitution and included several even which do not appear in the abstract, because this case turns, as will be seen hereafter, on the question of the power of the corporation, under its articles of association, "for religious and social purposes," to contract to levy and pay over to the "heirs" or family of a deceased member a death assessment.

The defendants in error are the widow and children, and therefore the heirs, of one Stephen Sikorski, who was prior to 1906 a member in good standing of the said Society of St. Stephen the Martyr, and who, it is claimed, was such a member at the time of his death, September 13, 1906.

The claim of the bill of particulars in the case is:

"For *life insurance* on the life of Stephen Sikorski amounting to Three Hundred Dollars ($300) and due plaintiff from the defendant on the death of said Stephen Sikorski, which occurred on, to-wit: September 13, 1906."

The defendant corporation filed two pleas, the general issue of *non-assumpsit* and *nul tiel* corporation,

and set up also a counter claim "for money due to the said Society and owing by Stephen Sikorski as dues and assessments levied on him by the said Society during his lifetime as its member." As, however, no written pleadings were necessary in this case in the Municipal Court, it does not matter that the contentions relied on here are not shown by the pleadings in that court, nor are we concerned with mere matters of practice, but must, in the language of the Municipal Court Act, decide the case "upon its merits as they appear from the statement or stenographic report signed by the judge."

The principal objections here made to the judgment are that it is based on an alleged contract *ultra vires* of the corporation, and also that there is no proof that the conditions provided for in article X, section 4, of the constitution of the Society, which would in any event alone make that alleged contract effective, existed. The position, however, is also taken that the evidence shows Sikorski not to have been a member of the Society in good standing at the time of his death. This was really the only question left to the jury in the court below. The trial judge charged the jury that if the evidence proved the deceased to be a member of the Society in good standing at the time of his death, his heirs were entitled to recover $300, but if he was proved to have been suspended before his death, and not to be in good standing at that time, they were not entitled to recover.

The jury found a verdict of $297.65—a sum evidently computed by deducting from $300 the amount the jury believed due from the deceased to the Society. On this verdict the trial judge entered judgment, after denying a motion for a new trial and a motion in arrest of judgment.

We do not think it necessary to discuss the evidence on this issue thus left to the jury. We should not have disturbed the judgment on the ground that the deceased was not a member of the Society. But we

think the case should never have gone to the jury, and that if it did so go, no verdict against the Society should have been allowed to stand, because this death loss sued on could not be a liability of this corporation.

Corporations whose charters express no other objects than social and religious purposes, are not allowed to make contracts of life insurance, either technically or substantially on the assessment plan or otherwise. It is true that after the general Incorporation Act was passed in 1872—which Act excepts corporations formed for the purpose of "insurance" from the benefit of its provisions—the legislature (in 1874) amended one of its sections (relating to corporations not for pecuniary profit) by adding the clause: "Associations and societies which are intended to benefit the widows, orphans, heirs and devisees of deceased members thereof, and where no annual dues or premiums are required, and where the members shall receive no money as profit or otherwise, shall not be deemed insurance companies." Under this amendment (further amended by Act of May 22, 1883, to include among the possible beneficiaries members who have received a permanent disability) the legislature evidently contemplated the incorporation of such assessment death and disability insurance associations, in accordance with the general incorporation Act. But there is nothing to show that it did not contemplate also the existence and enforcement of the general rule that the purpose of the corporation, if it were for such a purpose, should be clearly set forth in the articles of association, which were to stand for its charter. The presumption is to the contrary. But by Act of June 23, 1883, the Legislature, by enacting a statute entitled, "An Act to provide for the organization and management of corporations, associations or societies for the purpose of furnishing life indemnity or pecuniary benefits to widows, orphans, heirs, relatives and devisees of de-

ceased members, or accident or permanent disability indemnity to members thereof,'' and in said statute providing that all societies of a similar character in existence should comply with all its requirements, and repealing all laws or parts of laws in conflict with it, certainly prevented any doubt, if there would other-wise be one, that mere organization thereafter of a corporation not for pecuniary benefit, ''for social and religious purposes,'' not in the method prescribed by the Act of June 23, 1883, or professing to be made under it, did not authorize such corporation to make valid contracts for death benefits depending on the assessment of members.

This Act of 1883 as amended in 1887 was in force when the plaintiff in error in this cause was incor-porated in 1892. It was replaced by a similar Act in 1893 for assessment insurance companies, and by an Act passed at the same time for the organization and management of ''fraternal beneficiary societies,'' so-called. These Acts as subsequently amended are now in force.

We have no doubt that the alleged contract of life insurance on which this suit was brought was *ultra vires* of the defendant corporation.

It is urged in argument that the burial of the dead is a religious duty, one especially insisted on by authorized catechisms of Christian doctrine in the church to which the parties to this suit belong, and that therefore the collection and disbursement of money for funeral expenses may well be within the religious purposes for which the defendant corpora-tion was formed. It is undoubtedly true that the burial of the dead, or something equivalent thereto, is regarded by all Christian bodies and, so far as we know, by all races and creeds, as a religious duty; but the vice of the plaintiffs' reasoning on that proposi-tion in this case is apparent. We have no occasion to decide here what may or may not have been within the power of this or a similarly organized association

to contract to do in the matter of funeral or burial expenses of its members. The suit here is for "life insurance on the life of Stephen Sikorski" (plaintiffs' bill of particulars, rec. page 3); and the sections of the constitution under which money is claimed, and which have been hereinbefore set out, do not provide for burial expenses, except contingently. The amount of assessment life insurance provided for is to be diminished by the amount paid out by the Society for such burial expenses, if, and only if, "it takes the funeral of the member in its hands."

But even were.the contract relied on not *ultra vires,* there was an absence of proof of that which could make a liability.

The section of the constitution which provides for the obligation also specifies how the money should be raised. It does not apparently provide an absolute pecuniary obligation for the corporation itself, but binds the corporation to make assessment. In the absence of any evidence that the Society has made the assessment, or has any money on hand, how, under this section, can an action at law in *assumpsit* lie against it?

However, it is on the want of power in the association to make the contract sued on, that we place our decision.

It is plain that no question can be raised of the failure to plead specially this defense in the Municipal Court, and we do not think there is anything in the relations proved between the deceased or the suing beneficiaries and the corporation which estops it from setting it up. There were various and laudable purposes provided for by the constitution which were directly in line of the charter powers of the corporation. Those provided for by that constitution which were not within the charter powers, the deceased was presumed to know were unauthorized and illegal. National Home Building Association v. The Home Savings Bank et al., 181 Ill. 35.

The alleged contract sought to be enforced in the case at bar was void under the reasoning of this last cited cause, and being void it necessarily becomes our duty, under the Municipal Court Act, in deciding the case upon its merits, to reverse the judgment founded on it, despite the fact that the motion to take the case from the jury, made at the close of the plaintiffs' evidence, was not renewed at the close of all the evidence. The omission to so renew that motion may have waived the right to complain in any court of review of the precise error of refusing the peremptory instruction, and it certainly would prevent the Supreme Court, under their decisions, from considering the question of the sufficiency of the evidence. Joliet & Northern R. R. Co. v. Velie, 140 Ill. 59; Humiston, Keeling & Co. v. Wheeler, 175 Ill. 314. But it does not relieve us from the obligation of weighing the evidence and, as the plaintiff had nothing to sustain his judgment, of reversing it. The Appellate Court, unlike the Supreme Court, has on it the duty of thus considering and weighing the evidence.

The judgment of the Municipal Court is reversed.

*Reversed.*