SOUTHERN STATES COOPERATIVE, INC.

*v.*

RICHARD L. DAILEY, STATE TAX COMMISSIONER

(No. 14481)

Decided July 29, 1981.

*Chauncey H. Browning*, Attorney General, *C. Page Hamrick, III*, Special Assistant Attorney General, for appellant.

*Spilman, Thomas, Battle & Klostermeyer, G. Thomas Battle*, for appellee.

McGRAW, JUSTICE:

This case comes on appeal from a decision of the Circuit Court of Kanawha County, which reversed in part an administrative decision of the State Tax Commissioner, in which an assessment of business and occupation tax against the appellee, Southern States Cooperative, Inc., a Virginia corporation, was affirmed in part. The circuit court held that the transfer of property by the appellee to its local affiliated cooperatives in West Virginia is not subject to the West Virginia business and occupation tax because the appellee is not engaged in that activity with the object of gain or economic benefit, and therefore its activity does not constitute the business wholesaling,

taxable under W.Va. Code § 11-13-2c (1974 Replacement Vol.). The appellant, the Tax Commissioner of West Virginia, contends that the circuit court erred in reducing the business and occupation tax assessed against the appellee by the amount payable on the gross receipts from the transfer of property between Southern States and its affiliated cooperatives. He argues that Southern States is engaged in this activity for gain or economic benefit and that the transfers constitute wholesale sales because the local affiliated cooperatives are separate and distinct corporate entities. We find merit in these contentions and consequently hold that gross receipts from the transfer of property between Southern States and its local affiliated cooperatives are subject to the West Virginia business and occupation tax.

Southern States Cooperative, Inc., is an agricultural cooperative association organized under the Virginia Agricultural Cooperative Associations Act, Va. Code § 13.1-312 (1978 Replacement Vol.), with offices located at Richmond, Virginia. It operates both as a marketing and a purchasing cooperative although approximately 97 percent of it's business volume is purchasing. By its marketing activities, Southern States assists its members in merchandising goods produced by them, and benefits its members by reducing merchandising and transportation costs, avoiding congested markets, creating increased demand by advertising, and avoiding middlemen. As a purchasing cooperative, Southern States serves as a purchasing agent in the acquisition of agricultural goods and services for its members and patrons. By bulk purchasing and by maintaining a well organized system of distribution, the cooperative keeps its costs to a minimum and passes the savings of the system on to the farmer shareholders and patrons.

Southern States Cooperative, Inc., has a fifteen-member board of directors, ten of whom are elected by the farmer members and five of whom are appointed by the Deans of Agriculture of the five land-grant colleges of the states in which it operates; namely, Kentucky, West Virginia, Delaware, Maryland and Virginia. The board of directors

employs the officers and employees of Southern States. By statute members of a cooperative must be producing farmers. Va. Code § 13.1-321 (1978 Replacement Vol.). Members receive common voting stock as a part of their patronage refunds, which are actually returns of the overcharges on purchases. The remainder of the refunds to which members are entitled, are made in cash. Ownership of stock makes the farmers members of the cooperative.

The distribution of supplies from Southern States to farmers from its local warehouses is accomplished through three retailing methods: (1) branch stores; (2) franchise agencies; and (3) local affiliated cooperatives. Only local affiliated cooperatives are involved in this appeal.[1]

Local affiliated cooperatives are formed by farmers under the Virginia Agricultural Cooperatives Act as separate legal entities, with their own articles of incorporation and by-laws. The principal office of each local cooperative is in Richmond, Virginia. The president and vice-president of the local cooperatives are elected by the farmers in the area the cooperative serves, while the secretary and treasurer are employees of Southern States' Richmond headquarters. Each local cooperative in West Virginia has a contract of management with Southern States under which Southern States agrees to serve as agent and attorney-in-fact for the local cooperative.

With the exception of petty cash, all daily receipts coming into a local cooperative are deposited in a local bank account. Immediately thereafter a deposit or transfer check is written for the amount, transferring the funds to Southern States' account in Richmond. The local cooperative is given credit for these deposits. Other accounts payable owned by the local cooperative are submitted to

---

[1] Branch stores are owned outright by Southern States. Therefore the transfer of property from Southern States to its branch stores is not subject to the W.Va. business and occupation tax. *See* W.Va. Code § 11-13-1 (1974 Replacement Vol.). Franchise operations are not involved in this appeal because the circuit court correctly held that Southern States is subject to the business and occupation tax on wholesale sales to its independent franchise agencies.

the Richmond office and paid by Southern States check. They are charged back to the local cooperative.

At the beginning of each fiscal year, in light of the total purchasing volume of the local cooperative for the preceding year and anticipated expenses for the ensuing year, Southern States advises the local cooperative of the estimated fee for the year's purchasing operations. At the end of the fiscal year, after the actual cost of rendering the service has been determined by Southern States, adjustments are made to the fee charged the local cooperative. In the event the actual cost is less than the fee paid, the difference is credited to the local cooperative by Southern States. In the event the actual cost is greater, the difference is paid to Southern States by the local cooperative.

Southern States performs its services of purchasing and general assistance, including accounting, auditing, merchandising, personnel training, and publicity, pursuant to the contract of management between the local cooperative and Southern States. Also under the contract Southern States agrees to make available to the local cooperative all commodities or supplies manufactured, processed, assembled, handled, or distributed by it, and the local cooperative agrees to use the wholesale facilities and services of Southern States as its principal source of supply for those commodities. Local cooperatives may, however, handle goods distributed or handled by suppliers other than Southern States.

To administer its marketing and purchasing operations Southern States maintains a system of retail supervision with ten regional officers. The officers work with local cooperatives, branches and private agencies as consultants to the franchises and in direct control of the operation of the branches and of the local cooperatives under the contract of management. They select management employees and oversee the operations of the branches and local cooperatives.

During the audit period involved in this appeal, Southern States maintained regional offices in West Virginia at

Huntington and Clarksburg. These regional offices are set up to advise and work with branch store and local cooperative managers with respect to the supplies and products available through the Southern States distribution system and to help them with retail level marketing. The Huntington and Clarksburg locations also serve as distribution warehouses for the various retail outlets in the State.

Common stock dividends paid to cooperative members are limited by Southern States' corporate charter to a percentage set by Virginia law, regardless of the earnings of the retail operation.[2] Any earnings over and above the limited percentage dividend belong to the partrons who dealt with the cooperative. As a cooperative, Southern States has a contractual obligation to return any earnings above the limited dividend. After the dividends have been paid at the end of the year, the patronage refund rate is established, which determines the percentage to which each patron is entitled. Besides the common stock which members receive as part of their patronage refunds, a limited amount of preferred stock with a six percent dividend also exists. Preferred stock may be owned by individuals who do not transact business with the cooperative. Stock sales are the only way of acquiring the requisite capital for the formation of a new cooperative.

This case arises from an assessment of business and occupation tax issued by Richard L. Dailey, then tax commissioner, against Southern States Cooperative, Inc., pursuant to an audit of the corporation's business for the period of July 1, 1969 through June 30, 1974. The assessment was for a tax in the amount of $48,273.79, with a penalty of $13,908.66, based on the value of goods transferred from Southern States to its local affiliated cooperatives and franchise agencies within West Virginia

---

[2] The parties have stipulated that the common stock dividend is limited to six percent, but do not cite any authority for that position. Our research reveals that at the time of the occurrences involved in this appeal dividends were limited to eight percent per annum on the actual cash value of the consideration received. Va. Code § 13.1-322(d) (1981 Cum. Supp.).

during the audit period. In making his assessment, the commissioner determined that the transfers were wholesale sales by Southern States, the gross proceeds of which are taxable under the provisions of Chapter 11 of the West Virginia Code.

A timely petition for reassessment was filed by Southern States and an administrative hearing was held in accordance with W.Va. Code § 11-13-7b (1974 Replacement Vol.) on January 28, 1976. The State Tax Commissioner issued his administrative decision on September 7, 1976, which affirmed $40,955.35 of the tax originally assessed. The tax commissioner determined that Southern States was engaged in the business of wholesaling, but that a portion of the assessment, for the period of July 1, 1969 through June 30, 1970, was barred by the statute of limitations.

An appeal was taken to the Circuit Court of Kanawha County, which issued its decision and final orders on December 23, 1977 and May 8, 1978. The circuit judge held that the transfer and delivery of tangible property by Southern States to its local affiliated cooperatives in West Virginia is not an activity carried on with the object of gain or economic benefit, either direct or indirect, and therefore such activity does not constitute engaging in the business of selling tangible property at wholesale subject to the West Virginia business and occupation tax. Consequently, the court reduced the assessment by excluding the gross receipts from the transfer of goods to the affiliated cooperatives. This reduction is assigned as error in this appeal.

West Virginia Code § 11-13-2c provides that:

> Upon every person engaging or continuing within this State in the business of selling any tangible property whatsoever, real or personal, including the sale of food, and the services incident to the sale of food in hotels, restaurants, cafeterias, confectioneries, and other public eating houses, except sales by any person engaging or continuing in the business of horticulture, agriculture or grazing, or of selling stocks, bonds or other

evidence of indebtedness, there is likewise hereby levied, and shall be collected, a tax equivalent to fifty-five one hundredths of one percent of the gross income of the business, except that in the business of selling at wholesale the tax shall be equal to twenty-seven one hundredths of one percent of the gross income of the business.

In order to be subject to the business and occupation tax it is therefore necessary that the entity sought to be taxed be a "person" and engage in or continue in a "business" as defined by statute. W.Va. Code § 11-13-1 states in pertinent part that:

When used in this article, the term "person" or the term "company" herein used interchangeably, includes any individual, firm, copartnership, joint adventure, association, corporation, trust or any other group or combination acting as a unit, and the plural as well as the singular number, unless the intention to give a more limited meaning is disclosed by the context.

\* \* \*

"Business" shall include all activities engaged in or caused to be engaged in with the object of gain or economic benefit, either direct or indirect. "Business" shall not include a casual sale by a person who is not engaged in the business of selling the type of property involved in such casual sale. "Business" shall include the production of natural resources or manufactured products which are used or consumed by the producer or manufacturer and shall include the activities of a banking business or financial organization.

The appellant contends that Southern States is engaged in the transfer of goods to local affiliated cooperatives "with the object of gain or economic benefit" and further contends that as separate corporate entities Southern States and the local cooperatives are each "persons" under the applicable statutory provisions, and as such, gross receipts from transfers of tangible property between them are subject to the business and occupation tax. Southern States, on the other hand, contends that the local affiliated

cooperatives are operated in the same manner as branch stores and are simply a part of a unitary distribution system. It describes the distribution system of Southern States and its cooperatives as a group or combination of corporate entities acting as a unit within the meaning of W.Va. Code § 11-13-1. The system has as its most important objective the provision of quality agricultural merchandise at the retail level, with all other activities being subservient to that objective. The transfer of goods to the cooperatives is a means of reducing costs and passing the savings on to consumer members. Southern States claims that this transfer of goods is simply a part of the system aimed at reducing costs to the farmer-member at the retail level, that although the Southern States corporation and local affiliated cooperatives are separate corporations they are acting as a unit, and that under its system the "business" contemplated by W.Va. Code § 11-13-1 is carried on at the retail level where gain is realized.

We disagree with Southern States' contentions. Southern States, Inc. and its local cooperatives are separate legal entities within the meaning of W.Va. Code § 11-13-1. That section defines "persons," for purposes of the business and occupation tax, as including "any individual, firm, [or] copartnership. ..." In this case, the local affiliated cooperatives and Southern States fall individually into the aforementioned categories as "persons" for business and occupation tax purposes. The designation "group of combination acting as a unit" contained in W.Va. Code § 11-13-1 is used to include business configurations not otherwise specifically demoninated. When separte corporations fall into specific designations of taxable "persons" enumerated in W.Va. Code § 11-13-1, they do not constitute a "group or combination acting as a unit," despite the fact that they form part of a cooperative distribution system. Consequently, Southern States and its local cooperatives are individually taxable entities for business and occupation tax purposes. Business and occupation taxes are designed to reach virtually all business activities carried on within the state, *see Automobile Club of Washington v. State, Department of Revenue*, 27 Wash. App. 781, 621 P.2d

760, (1980), and a business ought not be permitted to avoid taxation merely because it is acting in concert with another.

The Supreme Court of Colorado has recently taken the same position on a similar issue in *Montgomery Ward Co. v. State Dept. of Revenue*, Colo., 628 P.2d 85 (1981). In that case, Montgomery Ward, a retail operation, sold a large percentage of its accounts receivable to Montgomery Ward Credit Corporation, a wholly owned subsidiary. The Colorado State Department of Revenue claimed that the sale of accounts receivable triggered the requirement to pay sales tax on the entire amount due on the sale. Montgomery Ward argued that it and its subsidiary credit corporation constituted a single "person" as defined by the applicable statute, and therefore the sale of accounts receivable was irrelevant for sales tax purposes.[3] The district court concluded as a matter of law that because Montgomery Ward Co. and Montgomery Ward Credit Corporation were separate corporations they could not be considered a "person" within the meaning of the statute, and consequently, Montgomery Ward Co. was required to pay sales tax on the sale of accounts receivable. The Supreme Court of Colorado affirmed the lower court's decision. *Accord, Ingraham v. City of Miami*, 388 So.2d 305 (Fla. 1980); *White Motor Corp. v. Kosydar,* 50 Ohio St.2d 290, 364 N.E.2d 252 (1977).

In this era of associated corporations with vast networks of holding and subsidiary companies, there are often times when the corporate form must be disregarded in the interest of justice. Courts will not allow the corporate form to be used to permit the perpetration of an injustice or the subversion of public policy. *U.S. v. Lehigh Valley R. Co.*, 220 U.S. 257, 55 L.Ed. 458, 31 S.Ct. 387 (1910). *Sanders v. Roselawn Memorial Gardens*, 152 W.Va. 91, 159 S.E.2d 784 (1968). With these considerations in mind Southern States

---

[3] The applicable Colorado statute defines "person" as including "any individual, firm, partnership, joint adventure, corporation, estate, or trust or any group of combination acting as a unit, and the plural as well as the singular number." Colo. Rev. Stat. § 39-26-102(16)(1973).

argues that we should view its local affiliated cooperatives as a fragment of the larger Southern States corporate combine, disregarding the corporate form in favor of what it alleges to be the reality of the situation.

Justice may require that courts look beyond the bare legal relationship of the parties to prevent the corporate form from being used to perpetrate injustice, defeat public convenience or justify wrong. However, the corporate form will never be disregarded lightly. The mere showing that one corporation is owned by another or that they share common officers is not a sufficient justification for a court to disregard their separate corporate structure. *Lipshie v. Tracy Inv. Co.*, 93 Nev. 370, 566 P.2d 817 (1977). Nor is mutuality of interest, without the countermingling of funds or property interests, or prejudice to creditors, sufficient. *First National Bank v. Walton*, 146 Wash. 367, 262 P. 984 (1928). Rather it must be shown that the corporation is so organized and controlled as to be a mere adjunct or instrumentality of the other. *Bonanza Hotel Gift Shop, Inc. v. Bonanza No. 2.*, 95 Nev. 463, 596 P.2d 227 (1979); *Duplan Corp. v. Deering Milliken, Inc.*, 444 F. Supp. 648 (D.S.C. 1977). Such a showing has not been made in this case.

Moreover, Southern States and its cooperatives have made a conscious decision to do business in the corporate form with its attendant advantages. These advantages include the limitation of personal liability, the continuity of corporate existence, and the facilitation of business administration. *See* I. Packel, *The Organization and Operation of Cooperatives* (1970). Having taken advantage of the benefits of incorporation, a corporation cannot decline to accept the liabilities of the corporate form in order to reduce the incidence of taxation. *Conway v. Jobin*, 115 N.H. 496, 345 A.2d 903 (1975); *Shelby County v. Barden*, 527 S.W.2d 124 (Tenn. 1975); *Noble v. C.I.R.*, 368 F.2d 439 (9th Cir. 1966). As was said in *Schenley Distillers Corp v. United States*, 326 U.S. 432, 66 S.Ct. 247, 90 L.Ed. 181 (1945):

> While corporate entities may be disregarded where they are made the implement for avoiding a clear legislative purpose, they will not be disregarded where those in control have deliberately adopted

the corporate form in order to secure its advantages and where no violence to the legislative purpose is done by treating the corporate entity as a separate legal person.

> 326 U.S. at 437, 66 S.Ct. at 249,
> 90 L.Ed. at 184.

Southern States has had the benefits of the corporate form and should not be allowed to disavow it to reduce the incidence of taxation. *Shelburne Sportswear Inc. v. City of Philadelphia*, 220 A.2d 798, 422 Pa. 199 (1966); *Bonnar-Vawter Inc. v. Johnson*, 157 Me. 380, 173 A.2d 141 (1961). The burden of taxation does not create a burden disproportionate to the benefits of incorporation and courts generally have been reluctant to disregard separate legal entities for the purpose of granting relief from taxation in such circumstances. *See. e.g., Moline Products Inc. v. Commissioner of Internal Revenue*, 319 U.S. 436, 63 S.Ct. 1132, 87 L.Ed. 1499 (1943). Consequently we hold that Southern States and its affiliated cooperatives are each "persons" as defined by W.Va. Code § 11-13-1, and as such the gross receipts from transfers between them are subject to the West Virginia business and occupation tax.

The appellant also contends that the circuit court erred in finding that the transfer of goods from Southern States to its local affiliated cooperatives was not an activity "engaged in or caused to be engaged in with the object of gain or economic benefit, either direct or indirect ...." W.Va. Code § 11-13-1. We agree.

It cannot seriously be contended that Southern States derives no gain or economic benefit from its wholesale transactions with its affiliated cooperatives. It is true that the transfers of property from Southern States to its local cooperatives are made on an actual cost basis, and therefore Southern States derives no direct *profit* from the transaction. However, the statute here involved, W.Va. Code § 11-13-1, does not refer to "profit", but to "gain or economic benefit." Gain or economic benefit is a much broader term than profit, *see, e.g., Bonnar-Vanter, Inc. v. Johnson, supra; State v. Zellner*, 133 Ohio St. 277, 13 N.E.2d

235 (1938), and includes the benefits Southern States receives from dealings with its cooperatives.

For example, continued existence as a corporation is in itself an economic gain. Southern States transfers property to its local affiliated cooperatives at actual cost which includes overhead, labor and materials. The local cooperatives pay Southern States for the goods received at a rate which allows Southern States to maintain itself and the facilities necessary to the operation of such an enterprise. Self-maintenance is a gain or economic benefit even though no profit is generated. *Bonnar-Vanter Inc., v. Johnson, supra.*

An indirect economic benefit may also include benefits to separate corporate entities as well as to the parent corporation. In *Shelburne Sportswear Inc. v. City of Philadelphia, supra,* a de jure corporation was devoted exclusively to the manufacture of "full fashion" knitting, which was supplied to Clover Knitting Mills, an operation related to the corporation. In exchange for this service, Clover provided sufficient funds for the corporation, to meet expenses, not calculated on price but on need. The corporation claimed it was merely a bookkeeping device and was not a business acting for "profit or gain." The court held that even though the corporation was not itself making a profit or gain it was obviously organized for the purpose of indirectly benefiting its shareholders by supplying their other operation with low cost material.

The same result was also reached under similar circumstances by the court in *Troy v. Lumberman's Clinic,* 186 Wash. 38, 58 P.2d 812 (1936), where it was stated:

> Profit does not necessarily mean a direct return by way of dividends, interest, capital account, or salaries. A saving of expense which would otherwise necessarily be incurred is also a profit to the person benefited. If respondent renders to *its incorporators or members, or to business in which they are interested* and in whose profits they share, a service at a cost lower than that which would otherwise be paid for such service, then respondent's operations result in a profit to its members.

(Emphasis added).
186 Wash. at 394, 58 P.2d at 816.

Thus, the operation of a corporation for the purpose of reducing costs for another related business entity, as in the case here, is no less engaging in a business for gain or economic benefit than the operation of a corporation for the direct profit to its shareholders. Corporations should not be permitted to avoid taxation by incorporating subsidiaries which act solely for the benefit of the parent corporation.

Southern States Cooperative, Inc., in its wholesaling function is doing that which it was organized to do: reduce the costs of quality agricultural supplies and services to its patrons and in doing so provide an economic benefit to them. The system of wholesaling allows for bulk buying, a more efficient distribution system and all the attendant economic benefits of that method of operation. In transferring goods to the local affiliated cooperatives Southern States enlarges its distribution system beyond its own branch stores. In a cooperative system, the ability of a corporation to reach a larger market through affiliated cooperative retailing outlets is in itself a gain, the economic consequences of which are realized in larger sales of the corporation's products and reduced costs through bulk purchasing. Therefore, the transfer of goods from an incorporated cooperative to a separately incorporated affiliate is an activity engaged in with the object of gain or economic benefit and is subject to the West Virginia business and occupation tax.

The benefits Southern States receives from the cooperative system accrue from the wholesale transfers. The reduced costs are not passed on to the shareholders and patrons until the retail sale is made and the patronage dividends are calculated, but the gain or economic benefit occurs at the wholesale level. The shareholders are paid on the basis of their Southern States stock, from the savings made through this system of wholesaling. The savings are a direct economic gain to the corporation. The wholesaling activity is therefore a business engaged in with the object of gain or economic benefit, as defined by W.Va. Code § 11-13-1.

In summary, Southern States Cooperative, Inc., and its affiliated local cooperatives are each "persons" pursuant to W.Va. Code § 11-13-1, and therefore are separately taxable corporate entities. Furthermore, the transfer of property from Southern States to its local cooperatives falls within the statutory definition of business activities "engaged in with the object of gain or economic benefit, either direct or indirect. . . ." W.Va. Code § 11-13-1.

For the foregoing reasons we reverse the decision of the Circuit Court of Kanawha County insofar that it did not require Southern States to pay business and occupation taxes on the gross receipts of transfers of property to its local affiliated cooperatives, and remand for proceedings consistent with this opinion.

*Reversed in part; remanded.*