STATE OF MAINE
CUMBERLAND, ss.

STATE OF MAINE
CUMBERLAND, SS
CLERK'S OFFICE

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. CV-01-168
REC CUM - 6/2 2003

ALTERNATIVE NURSING CARE, INC., P 1: 40
         Plaintiff


                    v.                          ORDER ON DEFENDANT BOISVERT'S
                                                MOTION FOR SUMMARY JUDGMENT

C.H. WRIGHT, INC. d/b/a
VARNEY CROSSING NURSING CARE CENTER,
AND RICHARD BOISVERT
                    Defendants.

DONALD L. GARBRECHT
LAW LIBRARY

JUN 16 2003


Defendant Richard Boisvert (Boisvert) moves for summary judgment on Counts

V and VI of Plaintiff Alternative Nursing Care's (ANC's) Complaint.[1]

## FACTUAL BACKGROUND

This case arises out of Varney Crossing Nursing Care Center's (Varney

Crossing's) inability to pay ANC for temporary healthcare workers provided to the

nursing home facility between the months of September 2000 and January 2001. ANC

terminated its relationship with Varney Crossing in February of 2001 because of the

significant arrearages.

Boisvert is the Administrator and sole shareholder, with his wife, of Varney

Crossing.[2] Rosalie White was the Director of Financial Operations for Varney Crossing.

Def.'s Statement. of Material Facts (DSMF) ¶ 1. White played no role in ordering staff

from providers such as ANC. DSMF ¶ 14. During the fall of 2000, White was working

on financial plans projecting/assuming an increase in the patient census and a

---

[1] Both parties agreed at the hearing that the appointment of a receiver for Varney Crossing by
Justice Fritzsche on May 11, 2001 served to stay all claims against Varney Crossing Nursing
Care Center. The parties also agreed that it was appropriate to proceed on the Boisvert claims.
[2] Although not in any statement of fact by either party, this fact was alleged in the Complaint,
admitted in the Answer, and is presumed in other statements of fact. Compl. ¶ 31; Answer ¶ 22.

corresponding increase in revenues. DSMF ¶ 4. Varney Crossing experienced an unexpected drop in census, due to a series of deaths, resulting in revenues much lower than projected. DSMF ¶ 9. However, White anticipated that a supplemental Medicaid reimbursement of $50,000 would arrive in the fall of 2000; that reimbursement was realized in December of 2000 in the amount of $26,000. DSMF ¶ 13. Throughout the fall, White and Boisvert were planning and intending to pay vendors. DSMF ¶ 16. Although Boisvert is not sophisticated in financial matters, he did work with accountants to procure a plan, which he believed would provide for repayment of its obligations and overall financial security. DSMF ¶¶ 16, 17, 20. Boisvert expected that the facility's census would increase and that the anticipated adjustment to the reimbursement rate would alleviate cash flow problems, as well as provide a lump sum of cash. Id. ¶¶ 21-22.

ANC first received Boisvert's assurance of his intent to pay ANC's accumulating bill in December of 2000. Id. ¶ 33. By letter dated January 16, 2001, Boisvert informed all of Varney Crossing's vendors, including ANC, that it was still awaiting the rebasing and reimbursement monies, but that he was planning to pay all of them. Id. ¶ 30. In response to the January 16th letter, ANC proposed a repayment agreement and stated that it would terminate services if the agreement was not executed. Id. ¶ 40. The only payments made to ANC prior to this ANC letter were on September 24, 2000 and on January 7, 2001. Id ¶ 38.

ANC's CFO, John Suglaski first became involved in October of 2000, when he investigated some "yellow flags" concerning the payment for services. Id. ¶¶ 41, 43. Suglaski was continuously unsatisfied with Varney Crossing's intent to pay sometime in the near future, and at no time did White tell him that payment was certain or give him indications as to when ANC might get paid. Id. ¶¶ 44 – 46. It was Suglaski's

understanding that upon receipt of the rebasing money, vendors' accounts would be paid down, but that there were no guarantees as to a definite amount. Id. ¶ 49.

ANC's policy is to work with nursing facilities in arrears and to see if the nursing home will recover its financial capabilities. Id. 58. For this reason and because an ongoing relationship makes collection of arrearages easier, ANC continued to provide services to Varney Crossing despite the accumulating balance and the understanding that Varney Crossing's finances were out of control. Id. ¶¶ 51, 52. In fact, in the fall of 2000, ANC offered, as part of a general promotion, a discount to Varney Crossing if it used ANC exclusively. Id. ¶ 55.

The basis for Plaintiff's claim is that Suglaski believes Boisvert could not have possibly made the representations that payments were forthcoming, when faced with the overwhelming evidence that such payments would be impossible. Id. ¶ 63. However, ANC understood that Boisvert was unfamiliar with the finances of the facility, had a reputation for management incompetence, and that he did not submit the requests for personnel himself. Id. ¶ 59, 60. ANC had the ability to terminate the relationship with Varney Crossing for nonpayment at any time between September 2000 and January 2001. Id. ¶ 62. As of the end of January 2001, the balance owed ANC by Varney Crossing was approximately $54,000. Id. ¶ 37.

On March 30, 2001 Plaintiff filed a six-count complaint. Counts I–IV and VI (punitive damages for fraud) are brought against the corporate Defendant Varney Crossing. Count V (fraud) and Count VI (punitive damages) are brought against the moving Defendant Boisvert.

## DISCUSSION

A party is entitled to summary judgment where there exists no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. M. R. Civ. P. 56(c); Saucier v. State Tax Assessor, 2000 ME 8, ¶ 4, 745 A.2d 972. A material fact

3

is one having the potential to affect the outcome of the suit. <u>Kenny v. Dep't of Human Services</u>, 1999 ME 158, ¶ 3, 740 A.2d 560. A genuine issue exists when sufficient evidence supports a factual contest to require a fact finder to choose between competing versions of the truth at trial. <u>Blanchet v. Assurance Co. of Am.</u>, 2001 ME 40, ¶ 6, 766 A.2d 71 (citation omitted).

The Complaint includes two counts of fraud, one against Varney Crossing and one against Boisvert. The fraud claim against Boisvert, Count V, appears to be actually an alternative equitable remedy, in that it alleges that the facts support piercing the corporate veil for the purposes of holding Boisvert personally liable. There are no allegations of independent or *ultra vires* acts on the part of Boisvert, which would cause him to be personally liable separate from any corporate liability. <u>See</u> Suglaski Depo., Ex. 1 (letter from Boisvert as Administrator); Suglaski Depo., Ex. 3 (letter to Boisvert as Administrator from Suglaski). Plaintiff's sole claim "against Boisvert" is that the acts of Varney Crossing, as well as those of Boisvert acting as its authorized agent, were fraudulent and malicious, entitling ANC to a judgment of fraud and an equitable remedy of piercing the corporate veil to reach Boisvert's personal assets. <u>State v. Placzek</u>, 380 A.2d 1010, 1015 (Me. 1977) ("The corporation obviously acts, and can act, only by and through its human agents . . . .").

Defendant contends that the fraud claim fails because there was no false representation made, only a promise of future performance that he did not know then to be false, and that ANC was not justified in relying on those representations given its knowledge of the Defendant's financial ineptitude.

> [A] defendant is liable for fraud or deceit if he (1) makes a false representation (2) of a material fact (3) with knowledge of its falsity or in reckless disregard of whether it is true or false (4) for the purpose of inducing another to act or to refrain from acting in reliance upon it, and (5) the plaintiff justifiably relies upon the representation as true and acts upon it to his damage. . . . Reliance is unjustified only if the plaintiff knows the representation is false or its falsity is obvious to him.

4

Letellier v. Small, 400 A.2d 371, 376 (Me. 1979). A claim for fraud must be proved by evidence that shows that the existence of fraud is "highly probable." Francis et al. v. Stinson et al., 2000 ME 173, ¶¶ 38-39, 760 A.2d 209; Barnes v. Zappia, 658 A.2d 1086, 1089 (Me. 1995). The general rule is that a plaintiff's burden of proof in a civil action is to establish each factual element of a claim by a preponderance of the evidence; in "civil actions involving allegations of fraud, we have required the higher standard of clear and convincing evidence." Petit, et al. v. Key Bank of Maine, 688 A.2d 427, 431 (Me. 1996).

There are material facts in dispute regarding the falsity of the representations made by Boisvert, as an agent of Varney Crossing, to ANC and whether Boisvert knew of their falsity, or recklessly disregarded their veracity. A trial that allows for weighing these facts, in conjunction with all other relevant evidence, is the appropriate vehicle for adjudicating this issue. Summary judgment is not. See Blanchet v. Assurance Co. of Am., 2001 ME 40, ¶ 6, 766 A.2d 71 ( holding that a genuine issue, requiring trial, exists when sufficient evidence supports a factual contest to require a fact finder to choose between competing versions of the truth).

Assuming, *arguendo*, that fraud could be found on the part of the Defendant as a matter of law, the court would need to determine whether the equitable remedy of piercing the corporate veil is appropriate under these facts. The Law Court has stated that courts should "disregard the legal entity of a corporation . . . with caution and only when necessary in the interest of justice." Theberge, et al. v. Darbro, Inc., et al., 684 A.2d 1298, 1301(Me. 1996) (quoting Bonnar-Vawter, Inc. v. Johnson, 157 Me. 380, 388, 173 A.2d 141 (1961)).

> [B]efore a court may pierce the corporate veil, a plaintiff must establish
> that: (1) the defendant abused the privilege of a separate corporate
> identity; and (2) an unjust or inequitable result would occur if the court
> recognized the separate corporate existence.

5

Johnson v. Exclusive Properties Unltd., 1998 ME 244, ¶ 6, 720 A.2d 528.

When attempting to pierce the corporate veil in the context of a contractual relationship, courts should apply "more stringent standards . . . because the party seeking relief in a contract case is presumed to have voluntarily and knowingly entered into an agreement with a corporate entity, and is expected to suffer the consequences of the limited liability associated with the corporate business form." Theberge, et al. v. Darbro, Inc., et al., 684 A.2d 1298, 1301 (quoting FLETCHER CYC CORP. § 41.85 (Perm ed.)). In the present case, ANC continued to service the needs of Varney Crossing pursuant to an agreement, well after ANC was aware of the nursing facility's dire financial straits. DSMF ¶ 40 (second agreement outlining continued service contingent on payment plan for arrears). In the fall of 2000, ANC attempted to become Varney Crossing's sole provider. DSMF ¶ 55 (offer to become exclusive provider).

Defendant contends that neither of the two elements of piercing the corporate veil is present. First, the undisputed facts present no indication that Boisvert "abused the privilege of a separate corporate identity"; only Boisvert's ownership and control have been alleged. Johnson v. Exclusive Properties Unltd., 1998 ME 244, ¶ 6, 720 A.2d 528 (noting twelve factors to consider when evaluating abuse of privilege – only one is supported by the instant facts – ownership/controlling interest). Second, there is no evidence of an unjust or inequitable result. ANC continued to extend credit to Varney Crossing with full knowledge of the "red flags." Theberge, et al. v. Darbro, Inc., et al., 684 A.2d at 1301( stating that because the party "voluntarily and knowingly entered into an agreement with a corporate entity," it "is expected to suffer the consequences of the limited liability associated with the corporate business form"). There is no evidence that ANC was treated differently from other vendors. Furthermore, Varney Crossing continues to operate in receivership and may still satisfy those obligations. Plaintiff has

opted not to respond to Defendant's argument beyond what may be inferred from the opposing statements of fact.

Because the facts properly before the court at summary judgment do not support the invocation of the doctrine of piercing the corporate veil and because there are no allegations of personal guarantees or *ultra vires* acts, summary judgment on Count V and Count VI, as they relate to Defendant Boisvert, is GRANTED.[3]

The entry is

Defendant Boisvert's Motion for Partial Summary Judgment is GRANTED.

Dated at Portland, Maine this 3rd day of June, 2003.

Robert E. Crowley
Justice, Superior Court

---

[3] A claim of punitive damages must be supported by clear and convincing evidence of ill will or outrageous conduct. Tuttle v. Raymond, 494 A.2d 1353, 1361 (Me.1985). Because the fraud does not survive summary judgment, there can be no recovery of punitive damages against Boisvert.

Date Filed __3-30-01__ __CUMBERLAND__ Docket No. __CV01-168__
County

Action __CONTRACT__

ALTERNATIVE NURSING CARE INC.

C.H. WRIGHT INC. d/b/a VARNEY CROSSING
NURSING CARE CENTER d/b/a MAINECARE OF
NORTH BERWICK f/k/a NORTH BERWICK
NURSING HOME
vs. RICHARD BOISVERT

| Plaintiff's Attorney | Defendant's Attorney |
|---|---|
| RALPH DYER ESQ<br>477 CONGRESS STREET SUITE 1010<br>PORTLAND ME 04101 | John McVeigh Esq. (BOTH)<br>PO BOX 9546<br>Portland ME 04112<br><br>Michelle Robert, AAG (DHS)<br>Jane Gregory, AAG (DHS - Interested party<br>6 State House Station<br>Augusta, ME 04333-0006 |